UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

VONTE GARDEJAVONO SHAW,

                Petitioner,                   Case No. 1:05-cv-301

v.                                       Honorable Paul L. Maloney

SHIRLEE A. HARRY,

                Respondent.

_____/

**OPINION**

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving consecutive sentences of 20 to 50 years and 24 to 36 months, imposed

by the Kent County Circuit Court on March 22, 2000, after Petitioner was convicted by a jury as a

second felony offender of one count of possession of more than 650 grams of cocaine, MICH. COMP.

LAWS § 333.7403(2)(a)(i), and one count of maintaining a drug house, MICH. COMP. LAWS

§ 333.7405(1)(d).  In his amended *pro se* petition (docket #29),[1] Petitioner raises four grounds for

relief, as follows:

      I.      PETITIONER'S CONVICTION WAS BASED UPON INSUFFICIENT
             EVIDENCE IN VIOLATION OF DUE PROCESS AS THERE WAS NO
             EVIDENCE TO PROVE THAT PETITIONER CONSTRUCTIVELY
             POSSESSED THE QUANTITIES OF COCAINE SEIZED FROM THE
             HOUSE SUFFICIENT TO SUSTAIN HIS CONVICTION.  U.S. CONST.
             AMS. 5 & 14.

---

[1]In an order issued on August 31, 2006 (docket #34), the Court granted Petitioner's motion to amend his petition to eliminate Grounds I and IV of the original petition (docket #1).  The Court indicated that Petitioner's proposed amended petition (docket #29) would be construed as a supplemental brief in support of his habeas corpus petition.

II.     PETITIONER VONTE SHAW WAS DENIED A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE UNITED STATES CONSTITUTION'S FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

III.    THE TRIAL JUDGE DEPRIVED VONTE SHAW OF HIS RIGHT TO PRESENT A DEFENSE BY EXCLUDING PETITIONER FROM CALLING AND CONFRONTING THE INFORMANT - THE ONLY WITNESS WHO, BY HIS CONFIRMED NON-EXISTENCE OR APPEARANCE AT TRIAL, COULD DECISIVELY CORROBORATE PETITIONER'S ACCOUNT OF EVENTS AND ESTABLISH HIS LIKELY INNOCENCE.  U.S. CONST. AMDS. 5, 6 & 14.

IV.     PETITIONER VONTE SHAW WAS DENIED A FAIR APPEAL AND THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Respondent has filed an answer to the petition (docket #8) stating that the petition should be denied.

Petitioner filed a reply to the answer (docket #27).  Upon review and applying the AEDPA

standards, the Court finds that Petitioner's claims are procedurally defaulted or are without merit.

Accordingly, the petition will be denied.

## Procedural History

### A.  Trial Court Proceedings

Petitioner was charged with possession with intent to deliver more than 650 grams

of cocaine and maintaining a drug house.  He was tried before a jury March 14-22, 2000.

Sergeant Scott Beckman testified that on January 13, 1997, Wyoming and Grand

Rapids police officers conducted a search of a residence located at 2419 Ansonia, SW, in the City

of Wyoming, after they received a tip from a confidential informant.  (Tr. II, 27.)  After the officers

knocked and announced their presence, Beckman breached the door with a mini-ram.  (Tr. II, 28-29.)

There were no people in the residence at the time of the search.  (Tr. II, 29, 39.)

Wyoming Police Officer Randy Adams testified as an expert canine handler.  (Tr. II, 47.)  Adams' dog, Quince, is trained to detect the odors of different types of narcotics.  (*Id.*)  Adams and Quince participated in the search at 2419 Ansonia.  (Tr. II, 48.)  They searched two bedrooms, living room, kitchen and garage.  Quince indicated that he smelled narcotics in both of the bedrooms.  (Tr. II, 49-50.)  There were no visible drugs in the areas where Qunice alerted.  (Tr. II, 52.)

Detective Scott Alward of the Grand Rapids Police Department testified that he obtained the search warrant for 2419 Ansonia after he received information from an informant.  (Tr. II, 56, 58.)  Alward did not wish to reveal the name of the informant because it could place the informant's safety at risk.  (Tr. II, 50-61, 96-97.)  Alward opined that if the names of informants were routinely revealed, they would not have informants.  (Tr. II, 61.)  Alward searched the southwest bedroom, where he found five cell phones, three phone chargers and some mail addressed to Petitioner at 2419 Ansonia dated from December 1996 through January 1997.  (Tr. II, 62-67.)  He also found a 1996 W-2 form issued to Petitioner with an address of 43 Burton, SW, apartment #2.  (Tr. II, 96.)  With regard to the phones, Alward could confirm that one of cell phones belonged to Petitioner.  (Tr. II, 85-86.)  Alward did not investigate the ownership of the other four phones.  (Tr. II, 86.)  According to the informant, the person who sold him the drugs was a black male, medium complexion, 5'10" or 5'11", 150 pounds, and had long hair and glasses.  (Tr. II, 82, 101.)  The physical description of the suspect provided by the confidential informant was different from Petitioner in that, at the time of trial, Petitioner was not wearing glasses, did not have long hair, and was approximately 5'8" tall.  (Tr. II, 72-73.)  Alward testified that the accuracy of descriptions given by informants run the gamut.  (Tr. II, 103-104.)  Despite some inaccuracies, Alward was confident

- 3 -

that Petitioner was the person described by the informant.  (Tr. II, 80.)  Alward did not have the name of the suspect until after the search warrant was executed.  (Tr. II, 100-101.)

Grand Rapids Police Detective Maureen O'Brien searched the northwest bedroom. (Tr. II, 131.)  O'Brien found a package of brown rubber bands and various documents bearing Petitioner's name with dates ranging from November 15, 1996 to January 7, 1997. (Tr. II, 131-134.) Among the items was a receipt issued to Petitioner for a $500 payment to Marshall Redder for 2419 Ansonia.  (Tr. II, 132.)  In light of the documentation, O'Brien believed that Petitioner was living at the residence at the time of the search.  (Tr. II, 141-42.)

Grand Rapids Police Detective Michael Rozema testified that he assisted with the search of the northwest bedroom.  (Tr. III, 8.)  Rozema seized a plastic cup from the top of the dresser that contained some baggies of crack cocaine.  (Tr. III, 8, 17.)  He also seized three pieces of identification belonging to Petitioner and some miscellaneous paper work.  (*Id.*)  The identification included a driver's license and a State of Michigan ID card.  Both listed his height as 5'9" and the state ID listed a weight of 150 pounds.  (Tr. III, 18.)  In the bedroom closet, Rozema found a shoe box contained approximately $275.00 in cash and a digital scale.  (Tr. III, 20-22.) Rozema testified that when he attended the preliminary examination in this case, Petitioner was wearing glasses.  (Tr. III, 23-24.)  Rozema inventoried a Ford Explorer that was found in the driveway at 2419 Ansonia.  (Tr. III, 34.)  The vehicle was registered to Robert Shaw.  (*Id.*)

Grand Rapids Police Detective Michael Mesman testified that an alarm went off when the police officers entered the house.  (Tr. III, 38.)  The officers found mail from ADT addressed to Petitioner.  (*Id.*)  Mesman search the west hallway, which ran between the two bedroom and the bathroom.  (*Id.*)  Mesman removed a ceiling tile and used a chair to view the area above the

- 4 -

other ceiling tiles.  (Tr. III, 39.)  He found three bags resting on top of the ceiling tiles - a black Samsonite camera bag, a purple velvet Crown Royal bag and brown paper bag.  (Tr. III, 39-40.) Inside the camera bag, Mesman found a total of eleven plastic bags of cocaine:  seven bags each contained two to three ounces of cocaine, three plastic bags each contained about one ounce of crack, and there was one "very small" bag of cocaine.  (Tr. III, 40-42.)  The camera bag also contained $1,060.00 in cash and a Century Cellunet agreement dated November 30, 1996, with the names Vonte Shaw and Leasha Brown. (Tr. III, 43-44, 47.)  The Crown Royal bag contained seven plastic bags of cocaine: six bags each contained about one ounce of cocaine and the seventh bag contained two to three ounces of cocaine.  (Tr. III, 43.)  Inside the brown paper bag, Mesman found a baggie containing three or four razor blades.  (Tr. III, 48.)  Mesman explained that razor blades were used in the drug trade for cutting drugs into smaller amounts.  (*Id.*)  Also inside the brown paper bag were one plastic bag with two large chunks of crack cocaine, one plastic bag with one large chunk of crack and some smaller pieces, one plastic bag with approximately fifty rocks of crack, one plastic bag with a chunk of crack, two plastic bags each containing approximately twenty rocks of crack, three small bags of crack and one bag with a few small pieces of crack.  (Tr. III, 49.) The brown paper bag also contained $70.00 in cash.  (Tr. III, 50.)  A total of $1,415.00 was seized from the residence.  (Tr. III, 56.)

Mesman further testified that he found mail addressed to Petitioner and other individuals at 2419 Ansonia, SW.  (Tr. III, 52-54.)  Mesman also seized two 8x10" photos of Petitioner from the residence.  One was hanging on the wall and the other was in a picture frame sitting on a large television.  (Tr. III, 56-57.)  Petitioner's hair was short in the photos.  (Tr. III, 80.) The house was fully furnished and there was food in the refrigerator.  (Tr. III, 87.)

- 5 -

Detective Mesman and other officers conducted surveillance at 2419 Ansonia and 43 Burton (Petitioner's mother's residence) on and off for a week or two following execution of the search warrant, but they were unsuccessful in locating Petitioner. (Tr. III, 64-66, 81-82.) Petitioner was not arrested until March 29, 1999. (Tr. III, 68.) According to Mesman, it is not unusual for two years to elapse between the issuance of an arrest warrant and the arrest. (Tr. III, 68.) Mesman had evidence that Petitioner had been in to California. (Tr. III, 81.) Mesman testified that it is not unusual for someone to hide drugs at someone else's residence, but thought it unlikely that a person would trust that quantity of cocaine in another person's possession. (Tr. III, 89.)

State Police Trooper Michael McKay testified that he stopped Petitioner on March 29, 1999, because the vehicle he was driving had a partially obstructed license plate. (Tr. III, 102-03.) Petitioner informed McKay that he did not have his driver's license with him, and gave McKay a false name and birth date. (Tr. III, 104.) McKay found no record for that person. (Tr. III, 105.) When McKay confronted Petitioner, he admitted that he had a suspended license and that there might be a warrant for his arrest. (Tr. III, 106.) McKay arrested Petitioner for not having a license and for providing false information. (Tr. III, 106.) McKay located Petitioner's true identification in a duffel bag in the trunk of his car and learned that there were four warrants out for his arrest. (Tr. III, 106, 108.) When Petitioner was booked at the Van Buren County Jail, he indicated that he wore glasses. (Tr. III, 107-08.)

Detective Mark Konynenbelt of the Grand Rapids Police Department testified as an expert in narcotics trafficking. (Tr. III, 117.) Konynenbelt testified that 2419 Ansonia was equipped with an ADT alarm system that went off when the officers executed the search warrant. (Tr. III, 134.) According to Konynenbelt, it was more common to find an alarm system in a house where

large amounts of drugs were stored than in a common drug house.  (*Id.*)  He told the jury that high-level dealers often keep large quantities of drugs in a "safe house": a trusted, low-traffic location that would not arouse the suspicion of police.  (Tr. III, 128-29.)  High-level drug dealers handle large quantities of drugs, i.e., quarter, half and whole kilos.  (Tr. III, 122-23.)  Konynenbelt testified that 923 grams of cocaine was found during the search, which is 73 grams short of a kilo. (Tr. III, 145.)  He opined that the wholesale value of the drugs was $23,000-$25,000 and that the drugs had a retail or "street" value of $30,000-$32,000.  (Tr. III, 146-48.)  According to Konynenbelt, the type of digital scale found in the northwest bedroom is commonly used to weigh drugs.  (Tr. III, 138.)  Konynenbelt testified that mid to high-level drug dealers typically use cell phones and pagers to conduct their business.  (Tr. III, 126-27.)  During his search of the kitchen, Konynenbelt found mail addressed to Petitioner at 2419 Ansonia that was dated from August through October of 1996.  (Tr. III, 135.)  He also seized several items of men's clothing from the northwest bedroom.  (Tr. III, 148.)  Property receipts from the time of Petitioner's arrest indicated that he had a pair of glasses, a contact case and contact solution on his person.  (Tr. III, 154-55.)

Cecile Herald of the Grand Rapids Police Department testified as an expert in the identification of controlled substances and fingerprint recovery.  (Tr. II, 109.)  In this case, Herald tested a total of 923.1 grams of cocaine.  (Tr. II, 119.)  Herald was unable to lift any latent finger prints from the baggies.  (Tr. II, 122.)  She estimated that she recovers prints from baggies less than ten percent of the time and only about half of them are usable.  (Tr. II, 121.)

Eddie Laird, a close friend of Petitioner's for twenty years, testified that Petitioner always had a short, clean hair cut.  (Tr. IV, 51.)  Laird also was acquainted with Tomika Shaw, Petitioner's brother.  Laird described Tomika as 5'11" tall and 155-160 pounds.  (*Id.*)  Laird was a

regular visitor at 2419 Ansonia, where Petitioner lived from the Fall of 1996 though January 1997. (Tr. IV, 55, 61.)  Laird testified that Petitioner essentially lived there by himself.  (Tr. IV, 61.)  Laird saw Tomika at the house off and on.  He also saw Petitioner's uncle, Robert Shaw, and other people at the house.  (Tr. IV, 56.)  Sometimes Laird saw Tomika and Robert at the house when Petitioner was not home.  (Tr. IV, 55-56.)  Laird had a key to 2419 Ansonia and sometimes he took girls there after they left the club.  (Tr. IV, 55-56.)  The alarm was never activated when Laird went to the house.  (Tr. IV, 75-76.)  According to Laird, Petitioner also spent time at his mother's house and at his girlfriend's apartment.  (Tr. IV, 59.)  Laird testified that Robert Shaw drove a Ford Explorer. (Tr. IV, 59.)  Laird had seen Petitioner drive the Explorer.  (Tr. IV, 78.)

Laird identified several pieces of clothing seized from the house as belonging to Petitioner.  (Tr. IV, 64-66.)  According to Laird, Petitioner was in Grand Rapids at the time the police raided his residence.  (Tr. IV, 66.)  Petitioner told Laird about the police raid of his house a couple of days after it occurred.  (Tr. IV, 69.)  Petitioner did not tell Laird why he did not return to his house after the police raid.  (Tr. IV, 77.)  Laird testified that Petitioner had frequently visited California after January 1997 but had not moved there.  (Tr. IV, 57, 64.)  When Petitioner was in Grand Rapids, he stayed with his mother at 43 Burton.  (Tr. IV, 78.)  Laird did not believe that Petitioner was hiding from anyone.  (Tr. IV, 84.)  Laird testified that he had seen Petitioner wearing sun glasses, but never eye glasses.  (Tr. IV, 71-72.)  Laird discussed his testimony with Petitioner two or three times before the trial.  (Tr. IV, 82.)

Petitioner testified that he was twenty-eight years old at the time of trial.  (Tr. IV, 91.) He admitted that he was the only person who lived at 2419 Ansonia in 1996, but claimed that he was not staying there in December of 1996 and January of 1997.  (Tr. IV, 91-92, 113.)  Robert Shaw,

Tomika Shaw, Eddie Laird and Petitioner's other brother, Alphonse Brown, all had access to Petitioner's house. (Tr. IV, 98.) Because he wasn't going to be living there anymore, Petitioner let his brother, Tomika Shaw, stay at the house. (Tr. V, 12.) Petitioner admitted that most of the clothing and mail found in the house belonged to him, but denied that the drugs found in the house belonged to him. (Tr. IV, 92, 108, 115.) He also denied ownership of the digital scale and cash found during the search. (Tr. IV, 130-131.) Petitioner further denied that he put drugs inside the camera bag and put it in the ceiling. (Tr. IV, 94, 133.) He claimed that he last saw the camera bag around Christmas of 1996, before he left for California. (Tr. IV, 94-95.)

Petitioner testified that he stayed in California from Christmas of 1996 through the first part of January 1997. (Tr. IV, 95.) Petitioner applied for a driver's license in California during a previous trip to that State in June or July of 1996. (*Id.*) Petitioner wanted to move to California because he was tired of all of the shootings in Grand Rapids. (Tr. IV, 104.) Petitioner stayed in California for months at a time, but was not trying to hide. (Tr. IV, 107.) Petitioner was not certain whether he was in Grand Rapids at the time of the raid, but said it was possible. (Tr. IV, 109.) Petitioner heard that a large amount of cocaine was seized from his house, but did not think it was necessary to contact the police because he was innocent. (Tr. IV, 151-53.) Petitioner never went back to 2419 Ansonia after the raid. (Tr. IV, 144.) He testified that his brother collected the personal property that was left after the raid. (Tr. IV, 142-46.) Petitioner requested termination of the ADT service before the raid occurred because he could not afford it and was moving to California. (Tr. IV, 99-100, 123-25.)

In 1996, Petitioner earned $1,017.20 working for West Michigan Janitorial. (Tr. IV, 132.) He also did some house painting and roofing. (Tr. IV, 133.) Petitioner estimated that he

earned $8,000 to $10,000 from his employment in 1996. (Tr. IV, 139.) Petitioner claimed to have difficulty paying his bills and child support. He gave a false name to the state trooper because he knew that a warrant had been issued against him for failure to pay child support. (Tr. IV, 102.) Petitioner admitted that he owned a large-screen TV, a diamond ring and a necklace with a diamond charm. (Tr. IV, 100-103.) Petitioner testified that one cell phone and one laptop computer seized from the house belonged to him. (Tr. IV, 130.) He did not know where the other four cell phones came from. (Tr. IV, 119.) He testified that his sister's name was on the phone contract with him because his credit was too bad for him to get one himself. (Tr. IV, 104-05.) Petitioner testified that he never had long hair. (Tr. IV, 96.) He also stated that he wore contact lenses and sun glasses, but never wore eye glasses. (Tr. IV, 105, 129-30.)

Laura Merritt testified that she had been Petitioner's girlfriend on and off for a period of years and they had two children together. (Tr. V, 14-15.) Merritt testified that she went to Chuck E. Cheese on the evening of January 12, 1997, to celebrate her daughter's birthday. (Tr. V, 15-16.) Merritt testified that she and Petitioner usually celebrate their children's birthdays together, but she could not recall whether Petitioner was there that evening. (Tr. V, 15-16.) Merritt admitted to telling Detective Konynenbelt that she thought Petitioner went with them to Chuck E Cheese. (Tr. V, 16, 18.) Detective Konynenbelt testified that Merritt told him, without equivocation, that Petitioner was with her on January 12, 1997, for their daughter's birthday party. (Tr. IV, 25.)

Tomika Shaw testified that he was convicted in 1998 of conspiracy to commit first-degree murder and aiding and abetting first-degree murder, for which he received a life sentence. (Tr. V, 56, 58, 66.) The murder was related to large drug shipment. (Tr. V, 58.) Tomika testified that he was 5'11" tall and 150-160 pounds. (Tr. V, 59.) In the Fall of 1996, Tomika testified that

he had long hair and wore glasses.  (Tr. V, 59-60.)  However, on cross-examination, Tomika admitted that he never wore glasses during his month-long criminal trial. (Tr. V, 68.) When Petitioner decided to move to California, Tomika agreed to take over the house at 2419 Ansonia. (Tr. V, 61.)  Tomika testified that he stayed in the northwest bedroom.  (Tr. V, 64.)  Tomika last saw the camera bag at the residence in January.  (Tr. V, 65.)  Before moving to 2419 Ansonia, he lived with his mother at 43 Burton.  (Tr. V, 71.)  Tomika claimed that he never saw drugs at 2419 Ansonia and that the drugs at issue in this case did not belong to him.  (Tr. V, 74-75.)  He further testified that he would not claim ownership of the drugs even if they had belonged to him.  (Tr. V, 80, 85-86.) Tomika went to California at the end of January.  (Tr. V, 81.)

The trial court instructed the jury on the charge of possession with intent to deliver more than 650 grams of cocaine and the lesser included offenses of possession of more than 650 grams of cocaine, possession with intent to deliver less than 50 grams of cocaine and possession of less than 25 grams of cocaine.  (Tr. VI, 84-87.)  The instructions for  possession with intent to deliver less than 50 grams of cocaine and possession of less than 25 grams of cocaine represented the smaller amounts seized from locations in the house other than from above the ceiling tiles.  The trial court also instructed the jury on the charge of maintaining a drug house.  At the conclusion of trial, on March 22, 2000, the jury found Petitioner guilty of possession of more than 650 grams of cocaine and maintaining a drug house.  (Tr. VII, 4.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 1, 2001, raised the following claims:

I.    REVERSIBLE ERROR OCCURRED WHEN THE TRIAL COURT'S INSTRUCTIONS MISLED THE JURY INTO BELIEVING THAT

POSSESSION OF OVER 650 GRAMS WAS A "LESSER" OFFENSE WITHIN POSSESSION WITH INTENT TO DELIVER, RESULTING IN AN IMPROPER COMPROMISE VERDICT.

II.    DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE MISLEADING INSTRUCTION THAT POSSESSION OF OVER 650 GRAMS WAS A "LESSER OFFENSE" THAN POSSESSION WITH INTENT TO DELIVER THAT AMOUNT, WHEN IT WAS NOT, DENIED DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL.

III.   DEFENDANT'S CONVICTIONS SHOULD BE VACATED, AND THE CHARGES DISMISSED, AS THE EVIDENCE AT TRIAL, EVEN VIEWED IN A LIGHT MOST FAVORABLE TO THE PROSECUTION, WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE DEFENDANT CONSTRUCTIVELY POSSESSED THE QUANTITIES OF COCAINE SEIZED FROM THE HOUSE.

(*See* Def.-Appellant's Br. on Appeal, docket #18.)  By unpublished opinion issued on May 14, 2002, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 5/14/02 Mich. Ct. App. Opinion ("MCOA Op."), docket #18.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered December 30, 2002, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #27.)

**C.  Post-conviction relief**

On July 9, 2003, Petitioner filed a motion for relief from judgment in the Kent County Circuit Court, raising the following claims:

I.     DEFENDANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL AND COUNSEL'S PERFORMANCE PROVIDES GOOD CAUSE AND PREJUDICE AS REQUIRED UNDER MCR 6.508(D) ET SEQ.

- 12 -

II.     THE TRIAL JUDGE ABUSED HIS DISCRETION WHEN HE REFUSED
        TO ALLOW THE INFORMANT TO BE CONFRONTED AND BY THE
        ADMISSION OF EXHIBITS, THUS VIOLATING MR. SHAW'S STATE
        AND FEDERAL CONSTITUTIONAL RIGHTS.

III.    DEFENDANT SHAW WAS DENIED DUE PROCESS AND A FAIR
        TRIAL, IN COMPLIANCE TO THE STATE AND FEDERAL
        CONSTITUTIONS, WHEN THE PROSECUTOR AND POLICE
        ENGAGED IN MISCONDUCT.

The circuit court denied Petitioner's motion on July 22, 2003, and his motion for reconsideration

on September 4, 2003.  The Michigan Court of Appeals and the Michigan Supreme Court denied

Petitioner's applications for leave to appeal on May 3, 2004 and December 29, 2004, respectively.

(*See* Mich. App. Ord. , docket #20; Mich. Ord., docket #21.)  Both courts found that Petitioner failed

to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  Both appellate

courts also denied Petitioner's motion for remand.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at

- 14 -

411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.    Sufficiency of the Evidence

Petitioner first claims that the prosecutor presented insufficient evidence that he constructively possessed the purported quantity of cocaine found at 2419 Ansonia.  Petitioner further maintains in his amended petition that the prosecutor failed to present competent evidence that the substances seized from 2419 Ansonia did in fact contain cocaine and weighed over 650 grams.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*,

506 U.S. 390, 401-402 (1993).   Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.   *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

In rejecting Petitioner's claim, the Michigan Court of Appeals stated:

Possession of a controlled substance can be actual or constructive. *People v Konrad*, 449 Mich 263, 271; 536 NW2d 517 (1995); *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000). For constructive possession, the issue is whether the defendant had dominion or control over the substance. *Id*. "[C]onstructive possession exists when the totality of the circumstances indicates a sufficient nexus between the defendant and the contraband." *People v Wolfe*, 440 Mich 508, 521; 489 NW2d 748, amended 441 Mich 1201 (1992). Circumstantial evidence and reasonable inferences from the evidence can be sufficient to establish possession. *Nunez, supra* at 615-616.

Defendant argues that the holding of *People v Lewis*, 178 Mich App 464, 468; 444 NW2d 194 (1989), where the Court found that there was insufficient evidence to prove that the defendant constructively possessed the cocaine, is instructive in this case. However, *Lewis* is distinguishable in that there was no evidence presented in *Lewis* that the defendant had control over the house in which the cocaine was found, contrary to the instant case. *Id.* at 468-469.

We hold that plaintiff presented sufficient evidence to establish defendant's control over the residence and, therefore, defendant had control, i.e., constructive possession, over the cocaine located within the house. See *People v Richardson*, 139 Mich App 622, 625-626; 362 NW2d 853 (1984). Defendant admitted to living at the residence and that most of the clothing and bills seized at the house belonged to him. Also, a witness testified that in the months before the search, defendant lived in the residence primarily by himself. Additionally, the paperwork and mail found with defendant's name at the residence were dated from August 1996 to January 1997.

Defendant argues that because his brother more closely matched the informant's description and that others had access to the residence, these facts precluded a finding that defendant constructively possessed the cocaine. However, possession can be found even when the defendant is not the owner of the controlled substance. *Wolfe, supra* at 520. Additionally, possession can be sole or joint. *Id*. Therefore, even if the jury believed that someone other than defendant was the owner of the cocaine, it was not precluded from also finding that defendant possessed the cocaine. Furthermore, this Court should not interfere with the jury's role of determining the weight of evidence or the credibility of witnesses. *Id*. at 514-515.

(MCOA Op. 3-4.)

Petitioner disputes the decision of the Michigan Court of Appeals that the prosecutor presented sufficient evidence that he constructively possessed the drugs found at 2419 Ansonia. Petitioner argues that the Michigan Court of Appeals "selectively culled the record to unreasonably find and misconstrue the facts to support its ruling." (Amend. Pet. 19.) Petitioner appears to misunderstand the standard applied to a claim of insufficient evidence. A habeas court reviews a sufficiency of the evidence claim after a conviction to determine whether "viewing the evidence in the light most favorable to the government, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" ' *McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir. 2003) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). "It is the province of the fact-finder, not this court, to weigh the probative value of the evidence and resolve any conflicts in the testimony." *Id.*

In this case, the prosecutor presented ample evidence from which the jury could conclude beyond a reasonable doubt that the Petitioner constructively possessed the drugs found at 2419 Ansonia. As noted by the Michigan Court of Appeals, Petitioner admitted that he lived at 2419 Ansonia, at least through November, 1996. (Tr. IV, 91.) He also admitted that most of the mail and clothing found in the house belonged to him. (Tr. IV, 92. 115.) Defense witness Eddie Laird testified that Petitioner lived alone at that residence form the Fall of 1996 through January 1997. (Tr. IV, 55, 61.) The police officers who searched the house on January 13, 1997, found several pieces of mail addressed to Petitioner at 2419 Ansonia dating from December 1996 through January 1997. (Tr. II, 62-67; Tr. III, 38, 52-54.) They also found various documents bearing Petitioner's name, including a receipt issued to Petitioner in January 1997 for a house payment on 2419 Ansonia

- 17 -

(Tr. II, 132); a Michigan driver's license and a state ID card issued to Petitioner (Tr. III, 18); and a Century Cellunet agreement dated November 30, 1996, that was in the same camera bag with eleven plastic baggies of cocaine (Tr. III, 43-44, 47). In addition, police officers discovered at the residence numerous items of personal property belonging to Petitioner, including a cell phone. (Tr. II, 85-86.) While Petitioner contends that the evidence more strongly implicated his brother, Tomika Shaw, the prosecutor presented more than sufficient circumstantial evidence that Petitioner at least jointly possessed the drugs found in the house.

Petitioner also appears to argue that the prosecutor failed to present competent evidence that the substances seized from 2419 Ansonia did in fact contain cocaine and weighed over 650 grams. Petitioner's claim is premised on the fact that all of the evidence seized at 2419 Ansonia was identified with complaint number 97-4470, but the laboratory report admitted at trial stated that it was for complaint number 97-4770. While Petitioner claimed on direct appeal that there was insufficient evidence to support his conviction, his theory focused exclusively on the issue of constructive possession. Petitioner did not raise a claim of sufficiency of the evidence in his motion for relief from judgment. Thus, Petitioner raised his theory concerning the quality and amount of the alleged substances seized from the house for the first time in his habeas petition.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4,

6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  This circuit has held that the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court.  *See Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir.1987);  *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir.1987).  Because Petitioner did not present this theory of insufficient evidence in the state appellate courts, it is unexhausted.

An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented.  28 U.S.C. § 2254(c).  "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred."  *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir.  2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991), *rev'd on other grounds*, 535 U.S. 635 (2002).  Under Michigan law,  a defendant may file only one motion for relief from judgment per conviction.  *See* M.C.R. 6.502(G)(1).  Because Petitioner has already filed a motion for relief from judgment, he no longer has an available state court remedy.  *See* 28 U.S.C. § 2254(c); MICH. CT. R. 6.502(G)(1). Consequently, his claim is considered exhausted, but it is procedurally defaulted.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  In order to obtain federal review of a defaulted claim, a petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986);  *Hicks v. Straub,* 377 F.3d 538, 551-52 (6th Cir. 2004).  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Petitioner claimed in his motion for relief from judgment that his appellate counsel was ineffective for failing to raise claims of ineffective assistance of trial counsel and a violation of the Confrontation Clause on direct appeal.  Petitioner, however, did not claim that his appellate counsel was ineffective for failing to raise sufficiency of the evidence with regard to the quantity and authenticity of the drugs.  Moreover, Petitioner did not raise the issue of the quantity and authenticity of the drugs in his motion for relief from judgment.  Thus, he cannot show cause for his failure to exhaust the claim in the state courts.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v.*

*Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Petitioner also fails to make a credible claim of actual innocence based upon new evidence.  Accordingly, Petitioner's claim regarding the quantity and authenticity of the drugs is barred from habeas corpus review.

II.    Ineffective Assistance of Trial Counsel

In his second ground for habeas corpus relief, Petitioner claims that his trial counsel was ineffective when he failed to:  (1) challenge the search warrant and move for production of the informant and suppression of the seized evidence; (2) prepare, recognize and object to irrelevant laboratory tests and reports admitted as evidence in this case; and (3) object to the misleading jury instruction that possession of over 650 grams of cocaine was a lesser included offense of possession with intent to deliver over 650 grams of cocaine.

A.    **Procedural Default**

Petitioner raised only his third claim of ineffective assistance of counsel on direct appeal.  The remaining two claim of ineffective assistance of counsel were raised for the first time in Petitioner's motion for relief from judgment.  The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's applications for leave to appeal because Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*, 501 U.S. at 801; *Engle*, 456 U.S. 107.  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state

procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks,* 377 F.3d at 551; *accord Lancaster,* 324 F.3d at 436-37; *Greer v. Mitchell,* 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell,* 274 F.3d 337, 348 (6th Cir. 2001).

Here, the Michigan Court of Appeals and the Michigan Supreme Court expressly denied Petitioner's application for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." Under M.C.R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett,* 211 F.3d 1004, 1006-1007 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda,* 211 F.3d at 1007; *Rogers v. Howes,* 144 F.3d 990, 994 (6th Cir. 1998).

In a case such as this, where the Michigan Court of Appeals and Michigan Supreme Court deny leave to appeal on the basis that a petitioner "failed to meet the burden of establishing

entitlement to relief under MICH. CT. R. 6.508(D)," it is sufficiently clear that the supreme court intended to invoke a procedural bar.  *See Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004); *Abela v. Martin)*, 380 F.3d 915, 923 (6th Cir. 2004); *see also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004); *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2002).  Accordingly, Petitioner's first two claims of ineffective assistance of counsel are procedurally defaulted.

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *See House*, 547 U.S. at 536*; Murray,* 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  Petitioner alleges that his appellate counsel was ineffective for failing to raise the issue in his direct appeal.  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must itself be properly exhausted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*,  274 F.3.d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted.  However, because the claim was rejected by the Michigan Supreme Court's application of MICH. CT. R. 6.508(D), the claim is also procedurally defaulted.  Therefore, in order for Petitioner to use his ineffective assistance of appellate counsel claim as "cause" to excuse his other procedurally defaulted claims, he must first meet the cause and prejudice standard for the ineffective assistance of appellate counsel claim itself.  *See Edwards*, 529 U.S. at 453; *Deitz v. Money*, 301 F.3d 804, 810 (2005); *Coleman*, 244 F.3d at 539.

Petitioner does not assert cause for his failure to raise his claims of ineffective assistance of appellate counsel on direct appeal.  However, it is unlikely that an appellate lawyer

would assert his or her own ineffectiveness on direct appeal.  In this case, Petitioner was represented by his appointed appellate attorney in his direct appeal before the Michigan Court of Appeals and the Michigan Supreme Court.  Consequently, Petitioner arguably was unable to raise his claim of ineffective assistance of appellate counsel until he filed his motion for relief from judgment.  Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone,* 243 F.3d at 971; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).  Accordingly, the Court will address the merits of Petitioner's claims of ineffective assistance of counsel.

### B.  Counsel's failure to challenge the search warrant

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of

- 24 -

professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

Petitioner first claims that his trial counsel was ineffective for failing to move for the appearance of the confidential informant and suppression of the evidence seized pursuant to the search warrant.  Petitioner asserts that the warrant was invalid because Detective Alward included false information in the affidavit.  The affidavit stated in relevant part:

> Your affiant is a member of the Grand Rapids Police Department currently assigned to the Vice Unit.  Your affiant met with a reliable and credible informant who indicated from personal knowledge that cocaine could be purchased at the above described premises.  This informant from personal knowledge is familiar the characteristics of cocaine, the manner in which cocaine is used and sold in the community.  When your affiant met with the informant, the informant directed your affiant to the described premises.  The informant had been at the above described premises within the last 36 hours and observed a quantity of cocaine being sold there.  The cocaine as described by the informant is being sold for various amount of US currency.
>
> The cocaine is easily concealed on or about the person.  When the informant left the premise[s], there were additional amount of cocaine on the premises being offered for sale.  The person(s) selling the cocaine is/are described as: B/M, 5'10"-5'11" 150 lbs medium complexion, long hair, glasses.
>
> Your affiant has known the informant six months and has made forty controlled purchases of controlled substances: cocaine.  All of these controlled purchases tested positive for the controlled substance cocaine.  The informant has supplied information on thirteen drug traffickers in the community said informant having been verified by your affiant through police records, personal observations, other police officers, and other reliable informants.  The said informant had supplied information for the issuance of nine prior search warrants.  The information led to the arrests of twelve subjects for violations of the controlled substances act.  This informant has never given any false information.

(Affidavit for Search Warrant, Appendix C, docket #29.)

In support of his contention that the affidavit contained false information, Petitioner relies upon the affidavit of his brother, Tomika Shaw.  (Affidavit of Tomika Shaw, Appendix B, docket #29.)  Tomika avers that he was residing at 2419 Ansonia on January 12, 1997, and spent the entire day at the house alone.  He states that no visitors came to the house on that date and no drug activity occurred on the premises.  Tomika further avers that he left the house on the morning of January 13, 1997 and did not return that day.  In light of his brother's statements, Petitioner maintains that the informant could not have purchased drugs at 2419 Ansonia within 36 hours before the affidavit was executed.  Petitioner alleges that he informed his attorney three months before trial about the inconsistencies between his brother's statements and the affidavit for search warrant. Petitioner believed  that Detective Alward intentionally lied about the existence of a confidential informant or that the confidential informant lied and Alward failed to independently investigate or corroborate the facts.

Petitioner's belief that the warrant affidavit contained false statements was based exclusively on the statements of his brother, Tomika Shaw.  Had counsel challenged the warrant, the trial court would have been presented with a credibility contest between Detective Alward and Tomika Shaw, who currently is serving a  life sentence for two counts of first-degree murder related to a large drug shipment.  Tr. V, 56, 58, 66.)  Moreover, Tomika Shaw had an obvious motive for denying that any drug activity had occurred at the residence.  There is little doubt that the trial court would have believed Detective Alward over Tomika Shaw.  Thus, Counsel's decision not to challenge the search warrant on that basis did not fall below an objective standard of reasonableness.

Petitioner further claims that counsel failed to discover that the warrant was issued

- 26 -

without a supporting oath or affirmation in violation of the Fourth Amendment.  At the heart of Petitioner's claim is the fact that the affidavit was signed only by Detective Alward.  Petitioner maintains that the court was required to sign both the affidavit and the warrant.  Under Michigan law, an affidavit for a search warrant may be made electronically.  The statute provides:

> (2) An affidavit for a search warrant may be made by any electronic or electromagnetic means of communication, including by facsimile or over a computer network, if both of the following occur:
>
> (a) The judge or district court magistrate orally administers the oath or affirmation to an applicant for a search warrant who submits an affidavit under this subsection.
>
> (b) The affiant signs the affidavit. Proof that the affiant has signed the affidavit may consist of an electronically or electromagnetically transmitted facsimile of the signed affidavit or an electronic signature on an affidavit transmitted over a computer network.

MICH. COMP. LAWS § 780.651(2)-(3).  Under the statute, when an affidavit for a search warrant is submitted electronically, the court administers the oath or affirmation orally and the affiant signs the affidavit and submits the signed affidavit to the court via facsimile or computer network.  The statute does not require the court to sign the affidavit.  The court only is required to sign the warrant.  Because no defect is apparent from the face of the affidavit, trial counsel was not deficient for failing to challenge the warrant on that basis.  "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697); *Smith v. Mitchell*, 348 F.3d 177, 199-200 (6th Cir. 2003).  Counsel's performance did not fall below an objective standard of reasonableness, thus, the Court need not reach the question of prejudice.

### C.      Counsel's failure to challenge the laboratory report

Petitioner contends that his trial counsel was ineffective for failing to move for suppression of the laboratory test results for the drugs allegedly seized from 2419 Ansonia. Petitioner claims that all of the evidence seized from 2419 Ansonia was identified with Complaint No. 97-4470, but the laboratory report admitted as People's Exhibit No. 4 (Appendix 6, docket #29) listed "Incident No. 97-4770." Petitioner contends that the cocaine was found in indistinguishable plastic baggies that could have come from or been mixed up with another case. Petitioner also contends that there are inconsistencies concerning the number of baggies involved and the locations or containers in which the purported cocaine was found. According to Petitioner, those facts belie any argument that the case number on the laboratory report was merely a typographical error. Petitioner maintains that without the laboratory report, the prosecutor could not have the sustained the charge of possession of more than 650 grams of cocaine.

Despite Petitioner's arguments to the contrary, it is apparent from the record that the the case number that appears on the laboratory report is nothing more than a typographical error. The similarity of numbers at issue here, 97-4470 and 97-4770, is obvious. Moreover, the evidence that was received and tested by the laboratory was consistent with the "Request for Analysis" forms (Appendix 6, docket #29) completed by Detective Mesman for Complaint No. 97-4470. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978). Because counsel's performance did not fall below an objective standard of reasonableness, the Court need not reach the question of prejudice. *Campbell*, 364 F.3d at 730; *Smith*, 348 F.3d at 199-200.

D.     **Counsel's failure to object to the jury instructions**

In his third claim of ineffective assistance of counsel Petitioner claims that trial counsel failed to object to the misleading jury instruction that possession of over 650 grams of cocaine was a lesser included offense of possession with intent to deliver over 650 grams of cocaine when simple possession carried a harsher penalty. Petitioner contends that since the term "lesser" was used, the jury was encouraged to reach a compromise verdict, finding him guilty of what it believed to an offense with a lesser punishment. On direct appeal, Petitioner also claimed that the trial court misled the jury by instructing it that simply possession was a lesser included offense of possession with intent to deliver a controlled substance of 650 grams. In the instant habeas action, Petitioner brings only his claim of ineffective assistance of counsel.

Applying the *Strickland* standard, the Michigan Court of Appeals concluded that counsel's failure to object to the jury instruction was not ineffective because the instruction was not erroneous under Michigan law:

In giving the jury its instructions, the trial court stated,

The principal charge against the defendant is that [sic] illegal possession with intent to deliver a mixture containing the controlled substance cocaine in an amount over 650 grams. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant knowingly possessed a controlled substance.

Second, that the defendant intended to deliver this controlled substance to someone else.

Third, that the substance was cocaine and the defendant knew it was.

Fourth, that the substance was in a mixture that weighed over 650 grams.

Now, with respect to that charge, the jury may also consider some lesser offenses in its deliberations. One of those offenses is that the defendant possessed more than 650 grams of cocaine. To prove the charge of possession over 650 grams of cocaine the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant possessed a controlled substance.

Second, that the substance possessed was cocaine.

Third, that the defendant knew he was possessing cocaine.

And, fourth that the substance was in a mixture that weighed over 650 grams.

In *People v Torres (On Remand)*, 222 Mich App 411, 416-421; 564 NW2d 149 (1997), this Court held that simple possession was a necessarily included lesser offense of PWID despite the fact that, at that time, the two offenses carried the same penalty and cited *People v Gridiron (On Rehearing)*, 190 Mich App 366, 369; 475 NW2d 879 (1991), amended 439 Mich 880 (1991). A necessarily included lesser offense contains all the elements of the greater offense. *People v Bearss*, 463 Mich 623, 627; 625 NW2d 10 (2001). It is impossible to commit the greater offense without also committing the necessarily included lesser offense. *Id.*

MCL 768.32(1) provides that the factfinder may find a defendant guilty of a "degree of that offense inferior to that charged in the indictment . . . ." The defendant in *Torres* argued that in order for an offense to be "inferior," its penalty must be less than the greater offense. *Torres, supra* at 419. However, the *Torres* Court held that where simple possession and PWID had the same penalty, simple possession was still a lesser included offense of PWID. *Id.* at 421. The Court reasoned that MCL 768.32(1)'s use of the word "inferior" did not refer to the "inferiority in the penalty associated with the offense, but, rather, to the absence of an element that distinguishes the charged offense from the lesser offense." *Id.* at 420.

Therefore, we conclude that even though simple possession carried a harsher penalty than PWID, the trial court was not in error when it labeled simple possession as a "lesser offense" of PWID. Because there was no error, we hold that defendant was not denied effective assistance of counsel. An attorney is not ineffective for failing to make a futile objection. *People v Fike,* 228 Mich App 178, 182; 577 NW2d 903 (1998).

(MCOA Op. 2-3) (footnotes omitted.)

Petitioner contends that his case is distinguishable from *Torres* because the simple possession charge in his case carried a greater penalty, not the same penalty, as possession with intent to deliver.  Consequently, Petitioner maintains that his trial counsel should have objected to the trial court's instruction characterizing simple possession as a lesser included of offense of possession with intent to deliver.  However, the *Torres* court clearly stated that the word "lesser" or "inferior" does not refer to the penalty for the offense, but to the absence of an element that distinguishes the charged offense from the lesser offense.  *Torres*, 564 NW2d at 154.  Thus, under the reasoning of *Torres*, the length of the potential sentence is irrelevant to determining whether simple possession was a lesser included offense.  *Torres* was decided three years before Petitioner's trial.  In light of *Torre*s, it was not objectively unreasonable for counsel to assume that simple possession was a lesser included offense of possession with intent to deliver, regardless of the penalty.  As stated by the Michigan Court of Appeals, a lawyer is not ineffective for failing to make a futile objection.  *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).  Because counsel's performance did not fall below an objective standard of reasonableness, the Court need not address prejudice.  *Campbell*, 364 F.3d at 730; *Smith*, 348 F.3d at 199-200.

Nevertheless, Petitioner cannot show prejudice because had his trial counsel objected to the jury instruction, the trial court would have denied the motion on the basis of *Torres*.  Moreover, as previously discussed, there was sufficient evidence to convict Petitioner of possession with intent to deliver over 650 grams of cocaine.  Thus, the decision of the court of appeals was not an unreasonable application of *Strickland*.

III.    Exclusion of Confidential Informant

In his third ground for habeas corpus relief, Petitioner claims that the exclusion of the confidential informant under Michigan's "informant's privilege," violated his constitutional right to present a defense and his Sixth Amendment right to confront witnesses against him as set forth in *Crawford v. Washington,* 541 U.S. 36 (2004). Petitioner raised this claim for the first time in his motion for relief from judgment, which was denied by the state appellate courts pursuant to MICH. CT. R. 6.508(D). As discussed above, the Michigan appellate courts' invocation of MICH. CT. R. 6.508(D) caused Petitioner's claim to be procedurally defaulted. However, the Court is not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003)*; Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178. Because Petitioner's confrontation claim is without merit, I will proceed directly to the merits.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to confront the witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 315 (1973). The test for evaluating Confrontation Clause claims originally was set forth in *Ohio v. Roberts,* 448 U.S. 56 (1980). In *Roberts,* the Supreme Court articulated a two-pronged test for determining the admissibility of a declarant's out-of-court statement:

> [First], the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66. The second prong recently was abrogated with respect to testimonial statements by *Crawford v. Washington,* 541 U.S. 36 (2004), where the Supreme Court held that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless: (1) the witnesses

are unavailable and (2) the defendant had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable.  However, the majority of circuits ruling on the retroactivity of *Crawford*, including the Sixth Circuit, have held that it is not retroactive.[2]  *See Lave v. Dretke,* 444 F.3d 333, 335 (5th Cir. 2006); *Espy v. Massac,* 443 F.3d 1362 (11th Cir. 2006); *Murillo v. Frank,* 402 F.3d 786 (7th Cir. 2005); *Dorchy v. Jones,* 398 F.3d 783 (6th Cir. 2005); *Mungo v. Duncan,* 393 F.3d 327 (2d Cir. 2004); *Brown v. Uphoff,* 381 F.3d 1219 (10th Cir. 2004); *Evans v. Luebbers,* 371 F.3d 438 (8th Cir. 2004); *McGonagle v. United States,* 137 F. App'x 373 (1st Cir. 2005), but see *Bockting v. Bayer,* 399 F.3d 1010 (9th Cir. 2005).  Because Petitioner's conviction became final before *Crawford* was decided, the Court's holding in *Crawford* is not applicable in his case.  Rather, Petitioner's case is governed by  the standard set forth in *Ohio v. Roberts.*

In this case, Detective Scott Alward of the Grand Rapids Police Department testified that he obtained the search warrant for 2419 Ansonia after he received information from an informant.  (Tr. II, 56, 58.)  This portion of Alward's testimony does not constitute hearsay because it was not offered for the truth of the matter asserted, but merely to explain how the officers obtained the search warrant.  The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.  *See Tennessee v. Street*, 471 U.S.

---

[2]Petitioner adopts the reasoning of Judge Clay's concurring opinion in *Fulcher v. Motley*, 444 F3d 791 (6th Cir. 2006), in which Judge Clay found that *Dorchy* did not treat *Crawford*'s retroactivity sufficiently to bind subsequent Sixth Circuit panels and subsequently concluded that Crawford was a "watershed" rule that should be applied retroactively to cases on collateral review.  This Court is bound by the court's decision in *Dorchy*, whereas Judge Clay's concurrence in *Fulcher* does not constitute biding precedent.  Moreover, other panels of the Sixth Circuit have followed *Dorchy* on the retroactivity question.  *See, e.g.*, *Winn v. Renico*,  175 Fed. Appx. 728, 732-733 (6th Cir. 2006); *Brandt v. Curtis*, 138 F. App'x 734,  739 n.4 (6th Cir. 2005).

- 33 -

409, 414 (1985); *See also United States v. Sales*, 247 Fed. Appx. 730 (6th Cir. 2007) (non-disclosure of confidential informant's identity did not violate right of confrontation because testimony did not disclose informant's statements and merely provided background information).  Alward further testified that the informant described the suspect as a black male, medium complexion, 5'10" or 5'11", 150 pounds, long hair and glasses.  (Tr. II, 82, 101.)  Because the description of the suspect was offered for the truth of the matter asserted, it constitutes hearsay subject to the limitations set forth in *Roberts*.  Assuming this portion of Alward's testimony did not satisfy the requirements of *Roberts*, thus violating the Confrontation Clause, the constitutional error is subject to a harmless error analysis.  On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623; *Vasquez*, 496 F.3d at 575.

    The physical description provided by the confidential informant did not have a "substantial and injurious effect" on the outcome of Petitioner's case.  The description provided by the informant was entirely consistent with Petitioner's theory of the case, i.e, that his brother, Tomika Shaw, was the owner of the drugs found in the house.  Petitioner testified that he was not living in the house in late December of 1996 or January of 1997, so he let his brother stay at the house.  (Tr. IV, 12.)  Tomika Shaw, who testified for the defense, stated that he was going to take over Petitioner's house because Petitioner was moving to California.  (Tr. V, 59.)  Tomika testified that he moved into the house in October 1996 and continued to live there until the search in January 1997.  (Tr. V, 62-63.)  Tomika descried himself as 5'11" and 150-160 pounds, which was consistent

with the description given by the confidential informant.  (Tr. V, 59.)  Tomika further testified at in the Fall of 1996, he had long hair and wore glasses.  (Tr. V, 59-60.)  Petitioner, on the other hand, testified that he never had long hair or eye glasses.  (Tr. IV, 105, 129-30.)  Petitioner's friend, Eddie Laird also testified that Petitioner never had long hair or wore eye glasses.  (Tr. IV, 51, 71-72.)  In his closing argument, defense counsel argued that Tomika Shaw better fit the description provided by the confidential informant and was living in the house without Petition at the time of the police search.  (Tr. VI, 45-47; 61-62.)  Defense counsel further argued that Tomika was still appealing his criminal conviction and life sentence, and, thus, had a reason to deny any further criminal activity. (Tr. IV, 62-63.)  Because the description given by the confidential informant supported Petitioner's theory of the case, the error clearly was harmless.

IV.    Ineffective Assistance of Appellate Counsel

In his fourth grand for relief, Petitioner claims that his appellate counsel was ineffective for failing to raise meritorious issues on appeal.  Specifically, petitioner claims that appellate counsel refused to raise on direct appeal all of the instances of ineffective assistance of counsel (Ground II) and the Confrontation Clause violation (Ground III).  As discussed above, Petitioner's claims in Grounds II and III are without merit.  Petitioner's appellate counsel was not deficient for failing to raise meritless claims on direct appeal. *See Buell*, 274 F.3d at 351.  Petitioner, therefore, is not entitled to habeas corpus relief.

## Conclusion

For the foregoing reasons, Petitioner's application for habeas corpus relief will be denied.

## Certificate of Appealability

- 35 -

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service.  It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted.  *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Commissioner of Correction of the State of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

- 36 -

constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of petitioner's claims. *Id.* The Court finds that reasonable jurists could not find that this Court's dismissal of each of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment consistent with this Opinion will be entered.

Dated: __September 29, 2008__          /s/ Paul L. Maloney
                                       Paul L. Maloney
                                       Chief United States District Judge